BENITA PEREÏRA, Plaintiff and Appellee, *v.* SANTIAGO AYUSO, Defendant and Appellant.

No. 6887. Argued March 17, 1936.—Decided May 19, 1937.

*Enrique Igaravídez* for appellant. *A. Rivas Rosario* for appellee.

Mr. Justice Wolf delivered the opinion of the court.

██ This was a suit to annul a deed of sale executed by Benita Pereira in favor of Santiago Ayuso and to obtain the cancellation of its record in the registry of property. To her complaint entitled "Nonexistence of a contract of sale, nullity of deed and cancellation of record in the registry of property," the plaintiff met with a demurrer. On appeal from a judgment in favor of plaintiff the overruling of the demurrer is assigned as error. The burden of the objections of appellant rests on the claim that the complaint fails to admit in any way that plaintiff executed the deed of conveyance, or to assign any reasons that would justify an action for the nonexistence of a contract. In paragraph 10 of the complaint the plaintiff admits the existence of a record of a deed purporting to be executed by her and paragraph 11 sets up facts strongly tending to deny that she executed the deed, ever gave her consent to any contract of sale, and more. The title of the action itself would help to guide the defendant. Perhaps this sufficiently meets the attack on the complaint. We have also a doubt whether the assignment was sufficient. A demurrer need only state that the complaint fails to state a cause of action, but the assignment should be more expansive.

However, the complaint would in any event hold for a cancellation of a contract of sale and the incidental cancellation of the deed and its record. At the trial we find no variance but such a defense would have been more appropriate.

 As to the merits at the trial, the theory of the court was that inasmuch as the plaintiff was an old lady of more that ninety years of age, the defendant should have carefully explained to her the whole nature of the transaction. The court found, in effect, that due to her feebleness, and insufficient mentality, she was never made to understand that she was alienating her property; that the consideration was not sufficiently proved and that the witnesses for the de-

fendant sometimes contradicted themselves and sometimes contradicted one another. The deed purported to be executed in the office of Antonio Ayuso and with regard to the latter's testimony the court said: "Before continuing with the analysis of this evidence, we wish to state that we have no doubt whatsoever that everything happened in the manner that the notary has explained in his testimony, . . ." The court, we think, was more especially referring to what happened as to the execution of the deed for the judge proceeds to exonerate the notary from responsibility for having authenticated it.

It seems convenient to review the evidence. Benita Pereira, the plaintiff, was the first to take the stand. She testified that she was over ninety years of age and owned a house in Santurce; that she met the defendant because she was having trouble in collecting the rents from her tenants and he was recommended to her by a friend; that she handed him her deed to the house and that later he told her they would have to go to San Juan; that they went to some office where there were several men among whom, she thought, were the judge and the prosecuting attorney (*Fiscal*); that she never knew what it was all about nor what he did and that she never intended to sell her house because it was left to her by her daughter; that she can neither read nor write; that she never signed anything or authorized anyone else to sign for her; that the defendant at times gave her half-dollars and quarters, and occasionally gave her dollars; that a month after her last visit to San Juan, the defendant moved her from her house to one of his own; that she thought it was in order to repair her house; that he collected the rents from her house and paid for her food from that money. On cross-examination, she said that she did not remember where she was brought to in San Juan; that she does not remember the number of persons that were there; and that she was left alone in one part of the room while the others went some-

where else; that she was taken there in an automobile which, she thought, belonged to the defendant; that the defendant supported her for several months in 1932 and that she bought her food with the money that he gave her.

The next witness for the plaintiff was Rafael Rosado, who said that he has a shop and has known the plaintiff for twelve years; that he thinks her house is worth about $800 and that she has bought a lot of things from him and spent about $1.50 a week in his store, which she paid regularly on Saturdays; and that she stopped buying from him in July 1932.

Antonia Pereira testified that she was forty-five years old, the plaintiff's niece, and that she knows that the plaintiff has or had a house; that she often went to see her; that the plaintiff moved sometime after July 1932; that in July 1932, the plaintiff had said to her: "Toña, I found a man who was going to buy my house and manage and rent it"; that she said his name was Santiago Ayuso; that she told the plaintiff to be careful; that she later went to see the defendant and he said to her, "She is a very old lady, and some of her tenants do not pay her and I am going to transfer the title from the name of the dead to the name of the living"; that he said he was going to do this with regard to the water and the taxes; that the plaintiff moved sometime in July and the witness found her in a small room where she told the witness that the defendant was going to fix the house; that the witness later spoke to the defendant and asked him why he had moved her aunt from her house and he said that her aunt quarrelled with the tenants; that her aunt moved back to her own house about five months before the trial; that the defendant has torn the fence and the porch which the house had because he was going to build on that lot.

This more or less sums up the testimony for the plaintiff. The defendant himself took the stand and at great length

told how he was asked to intervene in the affairs of Benita Pereira; that she lived in the deeded house, had tenants, but could not get along with them or her family; that after a while he had her moved to one of his own houses and later rented a small room for her; and that finally, without consulting him, she had moved back to her own house where she was living at the time of the trial. From none of the testimony in the case is it clear just how much the defendant, if anything, received as rent from the tenants of the plaintiff's house.

Incidentally, it may be said, that the court was of the opinion that Santiago Ayuso received or should be charged with having received rents from said tenants. The principal contention of the defendant was that he had advanced numerous small amounts to the plaintiff from time to time, but which rarely exceeded, however, more than two dollars a week; and that he had paid for certain necessary supplies for her in different shops. At the time of the trial, the defendant could produce but few of the accounts and testified that others had been destroyed in the cyclone.

The difficulty about all his testimony, to make a running comment, is that the period for which he was solely in charge of her affairs was a short one, that is, from about the end of 1931 to June or July 1932. The defendant failed to make it clear that he had paid, on behalf of Benita Pereira, anything like $300 which was the consideration recited in the deed. He may have paid out one or two other relatively small amounts for other purposes which we have not mentioned.

The notary, Antonio Ayuso, was a witness. His testimony was corroborated on certain points by his law associate Daniel Pellón, Jr., by the instrumental witnesses and by the person who signed the deed for the plaintiff, inasmuch as she could neither read nor write. He said more or less tha he remembered the deed in question; that the defendant

in this case was no relative of his, and that the incident with regard to the execution of the deed was like this:

"Santiago came to my office one day and told me that there was an old lady whom he had been helping out, who owned him a certain sum of money which he had given her in the form of supplies and sometimes half dollars, 75¢ and dollars, and that he wished to collect that money from the old lady. A few days went by and he told me: 'The old lady wants to pay me, she has some sort of trouble with her family,' and he showed up one day. I do not remember if one came first and the other later. Mario Vissepó was there. I had already prepared or proceeded to prepare the deed; I do not remember the exact amount which had been advanced to the old lady, they told me some three hundred dollars, because he said that he had been helping her for some time. Then came doña Benita Pereira with Santiago Ayuso. . . .

"Q.—Did both of them come?

"A.—Yes, sir and a witness by the name of Coto, who I think knew the old lady and don Mario was there and the old lady then related a story, that she had a niece or some relative, that she did not under any circumstances want her niece to inherit her property, or an aunt or a sister, I do not remember the story well, and that her only relative was Santiago who was the one that took care of her and supported her; that she would not leave anything to those who did not give her anything; that she wanted to give the house to Santiago Ayuso, that he had been supporting her, that he was the one who had taken care of her and that she wanted to have nothing to do with any one but Santiago Ayuso; then I called don Mario Vissepó and they all applauded the old lady's doings, that she said something about spiritualism, then I called don Mario as a witness and he asked her. 'What do you want?' And she said: 'What I want is to transfer the house to Santiago Ayuso who has been supporting me. He is my family. My other family does not care about me and I want to pay him.' Then I asked her more or less the amount. She could not state the precise sum. I asked whether four hundred dollars, or three hundred dollars. Then she said to me: 'Something like that.' Then I asked her: 'More or less now much?' (in order to estimate the money which he had given her, because Santiago likewise did not know the exact amount), then the sum of three hundred dollars was agreed upon. I think that is what the deed provides, I am not sure.

"Q.—How was it executed?

"A.—I explained very well to the old lady the kind of transaction which was to be made, specially as she did not know to read or write; not only did I read it to her, but I explained. 'You are going to transfer this house to Mr. Ayuso'. She said: 'Very well, very well.' 'Remember, that from today on the house will belong to him and not to you', and she says: 'Yes, Sir. What I want is that my niece, who has insulted and tried to strike me, should not have it.' "

Under these circumstances, the problem has not been an easy one. The court, however, as we have seen, found that due to her insufficient mentality, the plaintiff never gave her consent to the sale and that if she assented, nevertheless she did not understand the nature of the transaction. While there is no direct evidence tending to show that Benita Pereira had less intellect than would be usual in a person of her age, yet the court could see and hear her and take into consideration the witnesses of both parties to arrive at its conclusion. The appellant himself draws attention to her supposed vacillating testimony. Whatever there was could be weighed by the court as tending to show infirmity. More especially where a person of 93 or 94 is concerned a certain feebleness is more frequently the rule than the exception and the testimony tended to support the rule. Therefore, we do not feel in the final analysis, that we can override the conclusion at which the judge arrived.

The court also thought that no sufficient consideration was shown. Under certain circumstances the lack of a sufficient consideration in cases similar to this one is enough to avoid the sale, but since lack of consent is relied upon, the question of consideration is not so important and we need not discuss this point further.

Directly or indirectly we have considered the other assignments of error and the judgment should be affirmed.

Mr. Justice Travieso took no part in the decision of this case.